1
2
3
4
5
6
7
8
9          **IN THE UNITED STATES DISTRICT COURT**

10          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

11

12   LINDA MILLER,                          CASE NO. CV F 04-6048 LJO

13                    Plaintiff,            **DECISION   ON   SOCIAL   SECURITY**
                                            **COMPLAINT**
14          vs.                             (Docs. 16, 19.)

15   JO ANNE B. BARNHART,
     Commissioner of Social
16   Security,

17                    Defendant.
                                        /
18

19                          **INTRODUCTION**

20          Plaintiff Linda Miller ("plaintiff") seeks this Court's review of an administrative law judge's

21   ("ALJ's") decision that plaintiff is not disabled and is not entitled to disability insurance benefits under

22   Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433.  Pursuant to 28 U.S.C. § 636(c) and

23   F.R.Civ.P. 73, the parties agreed to proceed before a United States Magistrate Judge, and by a December

24   15, 2004 order, this action was assigned to United States Magistrate Judge Lawrence J. O'Neill for all

25   proceedings.  Based on review of the Administrative Record ("AR") and the papers of plaintiff and

26   defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Commissioner"), this Court DENIES

27   plaintiff's request to reverse the Commissioner's decision to deny plaintiff disability insurance benefits

28   or to remand for further proceedings.

                                    1

## BACKGROUND

### Personal Background

Plaintiff is age 50, has a high school education and past relevant work as a factory worker. (AR 15, 57, 73, 78, 273, 306.) Plaintiff suffered an April 9, 2001 work injury to her back to contribute to her alleged disability. (AR 288.)

### Administrative Proceedings

On November 5, 2002, plaintiff filed her disability insurance benefits application to claim disability since February 13, 2002 due to lower back problems. (AR 35, 57, 72.) With its December 16, 2002 Notice of Disapproved Claims, the Social Security Administration ("SSA") denied plaintiff's claim and determined that plaintiff's condition is not severe enough to prevent her to work. (AR 35.)

On January 23, 2003, plaintiff filed her Request for Reconsideration to claim that she is unable to lift 25 pounds and to stand, walk or sit for more than two hours. (AR 33.) With its February 7, 2003 Notice of Reconsideration, SSA denied plaintiff's claim and again determined that her condition is not severe enough to prevent her to work. (AR 29.)

On April 4, 2003, through newly appointed counsel, plaintiff filed her Request for Hearing by Administrative Law Judge to claim she is "totally disabled." (AR 27.) After an August 5, 2003 hearing, the ALJ issued his October 31, 2003 decision to conclude that although plaintiff is unable to perform her past relevant work, she is able to perform a significant number of jobs that exist in the national economy. (AR 15, 20-21.)

Plaintiff submitted to SSA's Appeals Council her November 14, 2002 Request for Review of Hearing Decision. (AR 10.) On June 4, 2004, the Appeals Council denied plaintiff's request for review to render the ALJ's October 31, 2003 decision as the Commissioner's final decision subject to this Court's review.

### Medical History And Records Review

Plaintiff has treated for various issues, including back injuries, the most recent of which she experienced when working.

#### *Family Medical Group Urgent Care*

After an August 10, 1999 work injury, plaintiff treated at Family Medical Group Urgent Care.

On August 12, 1999, Rob Trumball, M.D. ("Dr. Trumball"), diagnosed low back strain and took plaintiff off work during August 8-15, 1999. (AR 154.) David Rollins, M.D. ("Dr. Rollins"), completed August and September 1999 work status reports to note his lumbar strain diagnosis and recommended modified work with limitations to lift, push or pull up to two pounds and frequent change of positions. (AR 147, 149, 151, 153.) In his August 17, 1999 report, Dr. Rollins noted that plaintiff experienced gradual onset of low back pain on August 10, 1999 when lifting a stack of cartons weighing 50 pounds. (AR 150.) According to Dr. Rollins, plaintiff is "very poorly conditioned. She is obese, her posture is very poor." (AR 150.) Nonetheless, Dr. Rollins noted that plaintiff was "able to move about the examination room actually without much difficulty and get up and down off the examination table without assistance. She is able to do an unassisted sit-up, although she notes pain." (AR 150.) Dr. Rollins further observed:

> The difficulty is complicated in that she has contributory obesity, as well as poor conditioning and apparently markedly poor posture. Her examination does show some signs of symptom amplification, in that the patient's reported subjective complaints are disproportional to her objective findings. In my opinion, she is able to return to modified duty, with lifting, pushing and pulling limited to 2 pounds and frequent change of position (q. 10 minutes). The patient is quite adamant that she is unable to sit for more than 2 minutes and stand for more than 2 minutes without pain, however, she has done more than this in my office without any apparent difficulty. (AR 152.)

In an August 26, 1999 work status report, Dr. Trumball noted his diagnosis of right sciatica and limitation of minimal walking. (AR 148.)

### David B. Bybee, M.D., Treating Neurosurgeon

Plaintiff treated with neurosurgeon David B. Bybee, M.D. ("Dr. Bybee"), who prepared an October 28, 1999 report to note plaintiff had a spinal fusion in 1987. (AR 142.) Her chief complaint as of October 28, 1999 was recurrent back pain and right knee pain aggravated from an August 10, 1999 work injury which arose when plaintiff picked up cases "on an exceptionally busy and strenuous day." (AR 142.) Dr. Bybee noted plaintiff's pain along the outside and anterior area of plaintiff's right knee. (AR 142.) Dr. Bybee's plan was to give plaintiff a Depo-Medrol injection over the focal point of her right low back tenderness which Dr. Bybee assessed as "a strain kind of injury." (AR 143.) Dr. Bybee planned no further treatment or intervention on his part. (AR 145.)

On September 26 2002, plaintiff returned to treat with Dr. Bybee for lower back pain. (AR 139.) In his September 26, 2002 report, Dr. Bybee noted that on April 9, 2001, plaintiff "had another severe

exacerbation after spending the day beating the freezers to release the frozen boxes with a 30 lb. bar."

(AR 135.)  Plaintiff underwent physical therapy, had Cortisone injections, returned to work off and on

but was taken off work in February 2002 and did not return.  (AR 135.)  Plaintiff's pain averages nine

out of ten which is severe and despite daily pain medication.  (AR 135.)  Plaintiff's "pain is fairly well

localized across the lumbosacral region, extending down into both posterior thighs to the knee."  (AR

135.)

Dr. Bybee's examination revealed plaintiff as "a well developed female in no acute distress" who

is 5-foot-7 and weighs 206 pounds.  (AR 135.)  According to Dr. Bybee, an August 13, 2002 MRI

demonstrated postoperative changes with a stable appearing spondylolisthesis and fusion at L5/S1 with

an apparent intact fusion.  (AR 136.)  Dr. Bybee found plaintiff's symptoms consistent with painful

lumbar facet syndrome and recommended lumbar facet blocks just above the L 4/5 fusion.  (AR 136.)

Dr. Bybee provided plaintiff samples of Bextra, a nonsteroidal anti-inflammatory.  (AR 136.)

### Peter P. La Torre, M.D., Treating Physician

Plaintiff treated with Peter P. La Torre, M.D. ("Dr. La Torre"), for various issues.  In December

1999 and January 2000, Dr. La Torre treated plaintiff for chest congestion and pain and sinus and throat

infection.  (AR 250.)  Dr. La Torre took plaintiff off work for two weeks due to asthmatic bronchitis.

(AR 249.)  January 11, 2000 x-rays revealed no evidence of active cardiopulmonary process.  (AR 248.)

In February 2000, Dr. La Torre took plaintiff off work for an additional 12 days due to lung infection.

(AR 244, 247.)  In March and April 2000, plaintiff complained of chest and bilateral knee pain and

insomnia.  (AR 241.)  Dr. La Torre excused plaintiff form work for three days in March 2000.  (AR

241.)  In May 2000, Dr. La Torre prescribed a Nebulizer for plaintiff and excused plaintiff from work

for several weeks due to gynecological problems.  (AR 237, 240, 242.)  Dr. La Torre excused plaintiff

from June to mid-September 2000 work due to pelvic, abdominal pains.  (AR 234, 236, 238.)

On June 20, 2000, plaintiff complained of a pulled groin.  (AR 236.)  Dr. La Torre completed

a July 6, 2000 form to indicate that plaintiff's pelvic and abdominal pain disable her.  (AR 235.)  Dr. La

Torre estimated plaintiff would be able to return to her regular and customary work on August 31, 2000.

(AR 232.)  August 30, 2000 notes reflect that plaintiff hurt herself when lifting a desk, complained of

a pulled groin muscle, and noted that she "feels she can't work yet."  (AR 233.)  On September 8, 2000,

4

plaintiff complained of groin pain.  (AR 233.)  Dr. La Torre completed a September 11, 2000 form to note that plaintiff's pelvic and abdominal pain disable plaintiff.  (AR 231.)  Dr. La Torre estimated that plaintiff would be able to return to her regular or customary work on September 11, 2000.  (AR 230, 231.)  On September 28, 2000, plaintiff complained of shakiness, dizziness, ears hurting and sneezing.  (AR 230.)  Dr. La Torre excused plaintiff from work during September 25, 2000 to October 4, 2000 based on shakiness, dizziness and rapid heart rate.  (AR 227.)

On October 11, 2000, plaintiff complained of feeling tired and easily fatigued.  (AR 227.)  Notes reflect that plaintiff has a normal chest x-ray and a good halter monitor study.  (AR 227.)  In early October 2000, Dr. La Torre excused plaintiff from work for another two weeks due to heart, chest and fatigue problems.  (AR 226.)  On October 19, 2000, Dr. La Torre excused plaintiff from work for two to three weeks due to heart, blood pressure and chest symptoms.  (AR 225.)  Based on an October 19, 2000 ECG, Dr. La Torre diagnosed chest pain, pressure feelings, fast heart beat, irregular beat and mild tachycardia.  (AR 217.)  On November 10, 2000, Dr. La Torre excused plaintiff from work for the remainder of November due to heart and lung problems.  (AR 216.)  Dr. La Torre completed a November 10, 2000 form to note his diagnosis of irregular heart beat and chest pressure.  (AR 215.)

On December 4, 2000, Dr. La Torre excused plaintiff from work for a week due to asthmatic bronchitis.  (AR 213.)  On December 8, 2000, plaintiff complained of insomnia and requested sleep medication.  (AR 213.)  Dr. La Torre completed a December 18, 2000 form to note that asthma disables plaintiff.  (AR 212.)  On December 11, 2000, plaintiff called to request another excuse from work, and Dr. La Torre complied and excused plaintiff from work to early January 2001 due to persistent lung and asthma problems with shortness of breath.  (AR 211.)  Dr. La Torre noted: "I look like a fool when I keep writing these little notes or do we need to disable her permanently for her lungs and her asthma?"  (AR 211.)  On December 15, 2000, plaintiff was wheezing with congested lungs.  (AR 211.)

On January 3, 2001, Dr. La Torre excused plaintiff from work for another two weeks due to persistent dry cough and asthma.  (AR 210.)  January 12, 2001 notes reflect that plaintiff "wants [to] attempt back at work."  (AR 210.)  On January 12, 2001, Dr. La Torre excused plaintiff from work to January 16, 2001 due to change in her blood pressure medication.  (AR 209.)  On January 22 and 26, 2001, plaintiff complained that he back has hurt since she returned to work.  (AR 209.)  On January 26,

2001, Dr. La Torre excused plaintiff from work for 10-14 days due to a change in her blood pressure medication.  (AR 208.)  Dr. La Torre completed a January 26, 2001 form to reflect is diagnosis of hypertension under poor control and that plaintiff had returned to work January 7-26, 2001.  (AR 207.)  On February 9, 2001, Dr. La Torre excused plaintiff from work for a week due to blood pressure and heart rate problems.  (AR 206.)  On February 15, 2001, Dr. La Torre released plaintiff from work to February 19, 2001 due to blood pressure and rapid heart beat.  (AR 205.)  Dr. La Torre completed a February 23, 2001 form to note plaintiff's hypertension under fair control and improved blood pressure and rapid heart problems from new medication.  (AR 204.)

On July 5, 2001, plaintiff complained of left shoulder problems after her brother pushed her into a coffee table.  (AR 205.)  On July 27, 2001, plaintiff complained of an earache.  (AR 202.)  On December 28, 2001, plaintiff called for new muscle relaxants.  (AR 202.)

On January 10, 2002, plaintiff complained of left back pain from an old injury.  (AR 200.)  Dr. La Torre excused plaintiff from work to January 14, 2002 due to low back and buttocks pain and spasms. (AR 200.)  On January 15 and 18, 2002, Dr. La Torre excused plaintiff from work to January 22, 2002 due to rapid heart episodes and low back and buttocks pain and spasms slowing resolving.  (AR 199, 201.)  During 2002, plaintiff requested sleep, headache and other medication.  (AR 196-198.)

On April 17, 2003, plaintiff complained of high blood pressure, stress, depression and upset stomach.  (AR 195.)  Plaintiff noted she experienced back pain, spasms and pressure which proceeded to her left leg.  (AR 195.)

Dr. La Torre completed a May 3, 2003 questionnaire to concluded that plaintiff is able to perform full-time work and more than sedentary work, to lift 20 pounds occasionally and 10 pounds frequently during an eight-hour workday, to sit seven to eight hours during an eight-hour workday, and stand/walk one or two hours during an eight-hour workday.  (AR 190.)  According to Dr. La Torre, plaintiff's primary impairments are atopic (allergic) asthma, chronic obstructive pulmonary disease ("COPD"), hypertension, gastroesophagaeal reflux disease ("GERD"), chronic stress, headaches, chronic depression, postmenopausal symptoms, and chronic back pain.  (AR 190.)  Dr. Torre based his opinion on his "years of treatment," "office records of 25 years," and consultants' reports.  (AR 190.)  Dr. La Torre noted plaintiff's moderate restriction to dust and fumes and slight restriction to temperature extremes.  (AR

190.)  According to Dr. La Torre, plaintiff's asthma/COPD does not require a home breathing machine. (AR 191.)  Dr. La Torre did not plan pulmonary function tests or arterial blood gas studies.  (AR 191.) Dr. La Torre noted that plaintiff probably is able to work effectively full-time indoors but would need to avoid excess dust or other asthma triggers.  (AR 191.)  Based on plaintiff's treatment with Dr. Canga, Dr. La Torre observed that plaintiff's "back must limit her somewhat also probably."  (AR 191.)  Dr. La Torre noted he had not found plaintiff disabled.  (AR 192.)  Dr. La Torre noted he completed the questionnaire based on treating plaintiff for asthma, increased blood pressure, depression, stress, GERD and headaches and not for back problems.  (AR 196.)

### *Manuel L. Canga, M.D., Treating Physician*

Plaintiff treated with Manuel L. Canga, M.D. ("Dr. Canga"), after suffering an April 9, 2001 back injury when working.  Dr. Canga's initial diagnosis after the injury was lower back spasm, and Dr. Canga estimated plaintiff would be able to return to modified work on May 10, 2001.  (AR 263.)  On May 10, 2001, complained of back pain and was assessed with lower back spasms.  (AR 133.)  In a May 10, 2001 Occupational Status Report, Dr. Canga recommended that plaintiff return to modified work duty with no bending, squatting, climbing, twisting, pushing/pulling, reaching or lifting more than 10 pounds.  (AR 132.)  On June 15, 2001, plaintiff complained of back pain, and Dr. Canga diagnosed lumbar radiculopathy and low back sprain.  (AR 130.)  During summer 2001, Dr. Canga diagnosed plaintiff low back pain and spasms.  (AR 121-128.)  In a September 5, 2001 Occupational Status Report, Dr. Canga recommended that plaintiff return to modified duty with no squatting and limited bending, twisting, pushing/pulling, and lifting limited to 20 pounds.  (AR 120.)  In a September 20, 2001 Occupational Status Report, Dr. Canga recommended that plaintiff return to regular duties and diagnosed low back spasm.  (AR 118.)

In a February 12, 2002 Occupational Status Report, Dr. Canga recommended that plaintiff return to modified duty through March 15, 2002 with no bending, squatting, climbing, twisting, pushing/pulling or reaching, and lifting limited to 10 pounds.  (AR 116.)  In February through October 2002 Occupational Status Reports, Dr. Canga noted plaintiff was unable to return to work due to lumbar problems.  (AR 92, 94, 96, 98, 100, 102, 104, 106, 108, 110, 112, 114.)  May 18, 2002 notes reflect a Vicodin 5 mg prescription.  (AR 107.)  June 25, 2002 notes reflect a Vicodin 10 mg prescription.  (AR

7

1   101.)  In November and December, 2002, Dr. Canga diagnosed lumbar radioculopathy and found
2   plaintiff unable to return to work.  (AR 257-260.)

3         Through July 2003, Dr. Canga continued his lumbar radioculopathy diagnosis and successively
4   excused plaintiff from work to July 30, 2003 due to pain.  (AR 252-256.)  On March 12, 2003, Dr.
5   Canga continued his lumbar radiculopathy diagnosis and excused plaintiff from work to April 20, 2003.
6   (AR 255.)

7         Dr. Canga completed an April 7, 2003 questionnaire to note that plaintiff's lumbar problems
8   prevent her to perform full-time work at any exertional level, including sedentary.  (AR 91.)  Dr. Canga
9   concluded that plaintiff is able to sit, stand or walk less than two hours.  (AR 91.)  Dr. Canga noted that
10  he did not know how long plaintiff is able to sit, stand or walk during an eight-hour period.  (AR 91.)
11  According to Dr. Canga, plaintiff does not need to lie down or elevate her feet.  (AR 91.)  Dr. Canga
12  assigned February 28, 2002 as the date plaintiff became disabled to his assigned degree.  (AR 91.)

13                                   *Medical Imaging*

14        A June 13, 2001 magnetic resonance imaging ("MRI") of plaintiff's lumbar spine revealed a
15  Grade III L5-L1 spondylolisthesis which was fused posterolaterally and successfully to cause a "step-off"
16  of the spinal canal because of the marked deformity.  (AR 262.)  The MRI revealed evidence of neither
17  disk herniation, significant bony spinal stenosis, nor foraminal compromise.  (AR 262.)  The MRI further
18  revealed the other lumbar disks within normal limits.  (AR 262.)

19        An August 13, 2002 MRI of plaintiff's lumbar spine revealed stable spondylolisthesis and intact
20  fusion at L5-S1.  The MRI further revealed no evidence of herniation, interval development of disc
21  herniation, intradural or extradural mass, significant enhancement, or interval change since the June 13,
22  2001 MRI.  (AR 261.)

23                          *Paul Kaplan, M.D., Consultative Neurologist*

24        Dr. Paul Kaplan, M.D. ("Dr. Kaplan"), a consultative neurologist, performed an April 10, 2002
25  electromyogram which revealed abnormalities consistent with denervation and neuropathic interference
26  patterns in the distribution of the left S1 myotome.  (AR 187.)  Nerve conduction velocity studies of
27  plaintiff's lower extremities revealed no abnormalities.  (AR 189.)  Dr. Kaplan's impression was "acute,
28  severe radiculopathy of the left S1 spinal nerve root."  (AR 189.)

*Robert A. Rose, M.D., Consultative Neurologist (Qualified Medical Examiner)*

Robert A. Rose, M.D. ("Dr. Rose"), a consultative neurologist, prepared a June 19, 2002 report to conclude that plaintiff has acute severe radiculopathy at the S1 level and is "limited to no heavy work." (AR 185.) Dr. Rose prepared a supplemental December 23, 2002 report to note plaintiff's 1987 "quite major" injury requiring surgical intervention, 1994 or 1995 injury which "resolved spontaneously over time with treatment," and a less severe 1999 injury which responded rather quickly. (AR 285.) After review of medical and related workers compensation records, Dr. Rose found that plaintiff's major difficulty is her April 9, 2001 injury:

> These records do indicate to me that the patient suffered more from the 2001 injury than from any of the other injuries, and that she recovered from the other injuries *almost completely*. . . . There is nothing in these reports that would indicate any change in her overall disability. (AR 285.)

Dr. Rose conducted an April 10, 2002 qualified medical examination of plaintiff in connection with her workers compensation claim and prepared an April 10, 2002 report. (AR 288.) Dr. Rose summarized that after plaintiff's April 9, 2001 back injury, she worked off and on during April 2001, was taken off work in May 2001 until she returned to regular duty in September 2001 but was taken off again on February 13, 2002. (AR 289.) Plaintiff's chief complaints were constant low back pain aggravated by prolonged sitting, standing, lifting or activity, muscle spasms, swelling and burning on her left side, pain radiating down her legs and hip, hip weakness and numbness, and pain and weakness of both knees. (AR 289.) Dr. Rose's physical examination revealed plaintiff was 5-foot-7 and 205 pounds and a general examination within normal limits. (AR 295.) Dr. Rose noted tenderness in plaintiff's low back on the left side with spastic nodulation, weakness of the tibialis anterior of the left side, back pain with heel and toe walking, normal tandem walking, and negative Romberg test. (AR 297.) Dr. Rose diagnosed chronic lumbosacral myoligamentous sprain syndrome with evidence of radiculopathy, L5 left. (AR 297.)

Dr. Rose commented that plaintiff continues to experience symptoms from her April 9, 2001 injury and received various treatment with "limited improvement." (AR 297-298.) Dr. Rose found plaintiff permanent and stationary as of March 2002 based on plaintiff's back pain, particularly on the left side radiating into the buttocks and legs, considered slight to moderate and becoming moderate with

heavy lifting, bending or stooping, pushing or pulling and becoming greater than moderate with prolonged activities, back tenderness, limited back range of motion, intermittent spasms, left leg numbness, tingling and weakness, back spastic nodulation, and loss of left leg sensation.  (AR 298-299.) Dr. Rose limited plaintiff to no heavy work and found her unable to return to her prior factory work, "which is much too physically stressful."  (AR 299, 300.)  As for future care, Dr. Rose noted that plaintiff will require judicious use of analgesics and anti-inflammatories and may require medications to increase her pain threshold, invasive pain treatment, such as epidural injections, and further surgical intervention.  (AR 299.)

### *Physical Residual Functional Capacity Assessment*

Mark Tambellini, M.D. ("Dr. Tambellini"), completed a December 12, 2002 Physical Residual Functional Capacity Assessment to note that plaintiff is able to: (1) lift/carry 20 pounds occasionally and 10 pounds frequently; (2) stand/walk about six hours in an eight-hour workday; (3) sit about six hours in an eight-hour workday; (4) push/pull subject to the lift/carry limitations; and (5) occasionally climb ramp/stairs, balance, stoop, kneel, crouch and crawl.  (AR 172-173.)  Dr. Tambellini noted neither manipulative, visual, communicative nor environmental limitations.  (AR 174-175.)  Dr. Tambellini noted that limitations of lifting, pushing and pulling up to two pounds and frequent change of position "appear far too restrictive."  AR 177.)  On February 3, 2003, David Pong, M.D. ("Dr. Pong"), affirmed Dr. Tambellini's assessment.  (AR 178.)

### *Medications*

Plaintiff's medications have included Lortab 10/500, Soma 350 mg, Avalide 300 - 12.5 mg, Clonazepan .5 mg, Klonopin .5 mg, Prozac 40 mg, Aelphex 20 mg, Flovent 110, Hydrocodone 10/500, and Fluoxetine 40 mg.  (AR 87, 89.)

### **Plaintiff's Activities And Testimony**

### *Questionnaires And Statements*

Plaintiff completed an October 30, 2002 Disability Report Adult to note she is 5-foot-7 and weighs 205 pounds.  (AR 71.)  Lower back problems limit plaintiff's ability to work, stand and sit.  (AR 72.)  From September 1974 to February 2002, plaintiff worked as a factory laborer which required her to lift up to 20 pounds.  (AR 73.)  Plaintiff's lower back problems started on April 9, 2001 and prevented

1  her from working as of February 13, 2002, when she ceased work despite a change to light duties.  (AR

2  72.)

3      Plaintiff completed a November 20, 2002 Pain Questionnaire to note that her lower back pain

4  started on April 9, 2001.  (AR 68.)  The pain is easily triggered and goes into the back of plaintiff's legs.

5  (AR 68.)  Rest relieves the pain "some time."  (AR 68.)  Plaintiff takes Lortab and Soma daily for "little"

6  relief.  (AR 68.)  Plaintiff's medication causes no side effects.  (AR 68.)

7      Plaintiff completed a January 3, 2003 Reconsideration Disability Report to note her inability to

8  perform housework, walk, stand, sit, or engage in activities, such as bowling or sitting to watch a movie.

9  (AR 62.)  Pain makes plaintiff "feel sick" to decrease her appetite.  (AR 64.)  Plaintiff experiences

10  increased headaches and decreased sleep.  (AR 64.)  Plaintiff uses no devices to relieve pain.  (AR 69.)

11  Plaintiff's pain causes her difficulty to drive, perform household chores and walk.  (AR 69.)  Plaintiff

12  stops activities every five to ten minutes due to pain.  (AR 70.)  Plaintiff needs help with grocery

13  shopping and household chores and estimates that she is able to stand and sit 10 minutes.  (AR 70.)

14      ***Plaintiff's ALJ Hearing Testimony***

15      Plaintiff testified at the August 5, 2003 ALJ hearing that she lives with relatives, including her

16  teenage daughter.  (AR 306-307.)  Plaintiff lives in a house with two outdoor steps which she generally

17  goes up and down four times a day.  (AR 307.)  Plaintiff has a driver's license and normally drives to

18  the store once a week and to her doctor once a month.  (AR 308.)  Plaintiff drove herself to the hearing

19  which was 34 miles from her home.  (AR 308.)  Plaintiff does not work and receives workers'

20  compensation payments.  (AR 308.)

21      Plaintiff last worked a year and a half prior to the ALJ hearing at a frozen foods facility.  (AR

22  309.)  She stopped working because she hurt her back and has not returned to work.  (AR 309.)  When

23  asked if plaintiff is able to work "at any full-time job," plaintiff responded that she tried but could not

24  do a rehabilitation program.  (AR 309, 317.)  Plaintiff's lower back prevents her to work.  (AR 309.)

25  Years ago, plaintiff has a spinal fusion at L3.  (AR 310.)  Plaintiff has no pending surgeries.  (AR 310.)

26  Plaintiff's back hurts when she sits or stands too long.  (AR 310.)  Plaintiff is able to sit for 30 minutes

27  and to stand or walk 20 minutes.  (AR 310.)  Plaintiff is able to lift and carry 10 pounds.  (AR 310.)

28  Plaintiff experiences spasms which run from her back into her left ankle.  (AR 312.)  Because of her

1   back, plaintiff walks slowly, stops and breaths.  (AR 318.)

2       Plaintiff further claims that a knee problem prevents her to work.  (AR 310.)  Plaintiff is unable

3   to stand up straight, she leans, and places pressure on her knees.  (AR 310-311.)  Plaintiff has not been

4   prescribed an assistive device to help with walking.  (AR 311.)

5       Plaintiff has no side effects from her medication, except blurry eyes.  (AR 311.)  Plaintiff's

6   medication helps "some" with her pain.  (AR 311.)  Later in her testimony, plaintiff volunteered that her

7   medication makes her sleepy to explain why she took none prior to the hearing.  (AR 318.)  Plaintiff

8   takes depression pills but does not receive mental health treatment.  (AR 312.)  Plaintiff is depressed

9   because she is unable to work.  (AR 312.)  Plaintiff has asthma problems which are aggravated by hot

10  weather and wind.  (AR 315.)

11      Plaintiff spends most of her time lying down.  (AR 313.)  Plaintiff prepares herself meals but

12  does not perform light housekeeping.  (AR 313.)  Plaintiff goes to the store alone but has someone come

13  from the house to help her.  (AR 313.)  Plaintiff walks outside her home to get her legs moving.  (AR

14  313.)  Plaintiff participates in no social activities.  (AR 313.)  Plaintiff last went to a movie two years

15  ago.  (AR 314.)  Plaintiff does not use a computer.  (AR 314.)  A year and half ago, plaintiff took a two-

16  night bus trip to Reno to gamble.  (AR 315.)

17      Plaintiff is 5-foot-7 and weighs 198 pounds.  (AR 316.)  Plaintiff's weight puts pressure on her

18  back.  (AR 316.)

19                              **The ALJ's Findings**

20      In his October 31, 2003 decision, the ALJ identified the specific issue as whether plaintiff is

21  under a disability, defined as inability to engage in substantial gainful activity by reason of a medically

22  determinable physical or mental impairment that can be expected to result in death or that has lasted or

23  can be expected to last for a continuous period of not less than 12 months.  (AR 14.)  In concluding

24  plaintiff can perform a significant number of jobs that exist in the national economy, is not disabled and

25  thus ineligible for disability insurance benefits (AR 15, 20), the ALJ found:

26      1.      Plaintiff has medically determinable severe impairments of back pain, status post L5-S1

27              fusion, asthma, obesity and spondylolisthesis but which do not meet or medically equal

28              an impairment listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P,

                                    12

Appendix 1 ("Listing of Impairments").

2.      Plaintiff's allegations regarding her limitations "are not entirely credible."

3.      Plaintiff has the residual functional capacity to perform light work with limitations of occasional climbing stairs, stooping, balancing, kneeling, crouching and crawling.

4.      Plaintiff cannot perform past relevant work.

5.      Plaintiff is not disabled based on an exertional capacity for light work with the above occasional postural limitations and using section 202.20 of the Medical-Vocational Guidelines, 20 C.F.R., Part 404, Subpart P, Appendix 2 ("Medical-Vocational Guidelines").

6.      Although plaintiff's exertional and nonexertional limitations do not allow her to perform the full range of light work, using section 202.20 of Appendix 2 as a framework, there are a significant number of jobs in the national economy which plaintiff is able to perform.  Plaintiff is able to perform a significant number of the 1,600 light and sedentary administratively noticed jobs and thus existing in the national economy.  (AR 20-21.)

## DISCUSSION

### Standard Of Review

Congress has provided limited judicial review of a Commissioner's decision made through an ALJ.  *See* 42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision, made through an ALJ, when the determination is not based on legal error and is supported by substantial evidence.  *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work contrary to treating physician's findings).[1]  Substantial evidence is "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a preponderance, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  Substantial evidence "means such

---

[1]      "The district court properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards."  *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).

13

1  evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S.

2  at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

3      The record as a whole must be considered, weighing both the evidence that supports and detracts

4  from the Commissioner's conclusion. *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995.  If there is

5  substantial evidence to support the administrative finding, or if there is conflicting evidence that will

6  support a finding of either disability or nondisability, the finding of the Commissioner is conclusive.

7  *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  If the evidence is susceptible to more than

8  one rational interpretation, the court may not substitute its judgment for that of the Commissioner.

9  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th

10  Cir. 1999).

11      This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it

12  is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

13  whole.  *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988).  "A decision of the ALJ will not be

14  reversed for errors that are harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

15      Plaintiff bears the burden to prove that she is disabled which requires presentation of "complete

16  and detailed objective medical reports of her condition from licensed medical professionals."  *Meanel*

17  *v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)).

18  Plaintiff must furnish medical and other evidence about plaintiff's medical impairments.  20 C.F.R. §§

19  404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that shows that you are blind

20  or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical evidence to determine

21  whether you are disabled or blind.  You are responsible for providing that evidence.")

22      Here, plaintiff claims disability since February 13, 2002 primarily due to back problems and pain.

23  (AR 35, 57, 72.)  As discussed below, this Court finds that the ALJ properly evaluated the evidence and

24  that his conclusion that plaintiff is not disabled is based on proper legal standards and substantial

25  evidence.

26      With the above standards in mind, this Court turns to plaintiff's criticism of the ALJ's October

27  31, 2003 decision.

28  / / /

14

## New Evidence

Plaintiff contends the ALJ did not properly consider all medical evidence and submitted with her opening brief additional 2004 records of Kyle Heron, M.D. ("Dr. Heron"), Dr. Bybee and Dr. Canga and which reflect plaintiff's continuing pain management, including epidural injections but no recommended surgery. The Commissioner notes that the new records arose after the ALJ's October 31, 2003 decision and contain no information substantially different from that considered by the ALJ.

A remand is appropriate under 42 U.S.C. § 405(g) "where the new evidence is material and there is good cause for the failure to incorporate such evidence in the record in a prior proceeding." *Booz v. Secretary of Health and Human Services*, 734 F.2d 1378, 1380 (9th Cir. 1984); *Burton v. Heckler*, 724 F.2d 1415, 1417 (9th Cir. 1984). In 1980, Congress amended 42 U.S.C. § 405(g) to add a materiality requirement "at least in part to limit the court's ability to remand cases for consideration of new evidence." *Ward v. Schweiker*, 686 F.2d 762, 764 (9th Cir. 1982) (citing *Carter v. Schweiker*, 649 F.2d 937, 942 (2nd Cir. 1981)).

"To meet the materiality requirement, the new evidence offered must bear directly and substantially on the matter in dispute." *Burton*, 724 F.2d at 1417. "[E]vidence is sufficiently material to require a remand, 'only where there is a *reasonable possibility* that the new evidence would have changed the outcome of the [Commissioner's] determination had it been before him.'" *Booz*, 734 F.2d at 1380 (quoting and adopting *Dorsey v. Heckler*, 702 F.2d 597, 604-605 (5th Cir. 1983)) (italics in original). "The good cause requirement often is liberally applied where . . . there is no indication that a remand for consideration of new evidence will result in prejudice to the [Commissioner]." *Burton*, 724 F.2d at 1417-1418.

Plaintiff fails to explain how the more recent records are material and their potential effect on the ALJ's decision. This Court is not in a position to speculate as to the materiality of the new evidence. If the evidence indicates deterioration after the hearing, it would be material to a new application and not probative of plaintiff's condition at the time of the August 5, 2003 hearing. *See Sanchez v. Sec. of Health and Human Servs.*, 812 F.2d 509, 512 (9th Cir. 1987). Plaintiff fails to demonstrate ALJ error to consider all medical evidence.

/ / /

## **Listing Of Impairments**

Plaintiff argues that the evidence supports disability under Listing 1.04 (disorders of the spine). The Commissioner responds that plaintiff failed to demonstrate that she met or equaled a listed impairment.

The SSA regulations provide: "If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled." 20 C.F.R. §§ 404.1520(c), 416.920(c). "Basic work activities" are the "abilities and aptitudes necessary to do most jobs," including "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling" as well as "[u]nderstanding, carrying out, and remembering simple instructions." 20 C.F.R. §§ 404.1521(b)(1), (3), 416.921(b)(1), (3). At step two of the five-step disability analysis, "the ALJ must consider the combined effect of all of the claimant's impairments on her ability to function, and without regard to whether each alone was sufficiently severe." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). Such inquiry "is a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290 (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-154, 107 S.Ct. 2287, 2297-2298 (1987)).

The purpose of the Listing of Impairments is to describe impairments "severe enough to prevent a person from doing any gainful activity." *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885 (quoting Social Security Ruling (SSR) 83-19, Dept. of Health and Human Services Rulings 90 (Jan. 1983)). If a claimant meets or equals a listed impairment, he/she is disabled. *Tackett*, 180 F.3d at 1099.

The United States Supreme Court has explained application of the Listing of Impairments:

> The listings . . . are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results. For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify. . . . "The level of severity in any particular listing section is depicted by the *given set* of findings and not by the degree of severity of any single medical finding – no matter to what extent that finding may exceed the listed value."
>
> . . .
>
> The [Commissioner] explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience,

16

from performing *any* gainful activity, not just "substantial gainful activity."

*Sullivan v. Zebley*, 493 U.S. 521, 530-531, 110 S.Ct. 885 (1990) (italics in original; citations omitted).

"While the Listing of Impairments does describe conditions that are generally considered severe enough to prevent a person from doing any gainful activity, an ALJ should not consider a claimant's 'impairment to be one listed in Appendix 1 solely because it has the diagnosis of a listed impairment. It must also have the **findings** shown in the Listing of that impairment.'" *Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990) (quoting 20 C.F.R. § 404.1525(d)); *Key v. Heckler*, 754 F.2d 1545, 1549-1550 (9th Cir. 1985)) (bold added).

Plaintiff bears the burden of proof to demonstrate that she has an impairment that meets of equals one of the listed impairments. *Tactett*, 180 F.3d at 1098. To "meet" a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his/her claim. *Tackett*, 180 F.3d at 1099. To "equal" a listed impairment, a claimant must establish symptoms, signs and laboratory findings at least equal in severity and duration to the characteristics of a relevant listed impairment. *Tackett*, 180 F.3d at 1099. Medical equivalence must be based on medical findings in the evidence supported by medically acceptable clinical and laboratory diagnostic techniques. *Tackett*, 180 F.3d at 1100; 20 C.F.R. §§ 404.1526(b) and 416.926(b).

As a matter of law, the ALJ need not "state why a claimant failed to satisfy every different section of the listing of impairments," in particular when the ALJ's evaluation of the evidence is an adequate statement of the "foundations on which the ultimate factual conclusions are based." *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990). "An ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005); *see Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001).

In the case at hand, the ALJ correctly concluded that the "record does not show an impairment or combination of impairments that meets or equals the criteria of any listed impairment." (AR 16.) The ALJ thoroughly evaluated the medical evidence. (AR 16-18.) Plaintiff points to insufficient medical signs, symptoms or laboratory test results to demonstrate that her alleged impairments meet or equal

Listing 1.04.  Plaintiff points to no findings of an impairment of Listing 1.04.  Plaintiff comes no where close to meeting her burden that her condition meets or equals a Listing of Impairments.

### Physician Opinions

In a scattered, haphazard approach, plaintiff questions the ALJ's evaluation of physician opinions and in particular, that of Dr. Canga.

A treating physician's opinion is not conclusive as to a claimant's physical condition or the ultimate issue of disability and may be disregarded by the ALJ even when it is not contradicted. *Rodriquez v. Bowen*, 876 F.2d 759, 761-762, n. 7 (9th Cir. 1989); *Magallanes*, 881 F.2d at 751; *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).[2]  An ALJ may reject a treating physician's opinion whether or not it is contradicted, if the opinion is "brief and conclusory in form with little in the way of clinical findings to support its conclusion."  *Magallanes,* 881 F.2d at 751.  Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute specific, legitimate reasons to reject the opinion.  *Matney*, 981 F.2d at 1020.

The Ninth Circuit has further explained:

> To reject the opinion of a treating physician which conflicts with that of an examining physician, the ALJ must "'make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" . . . "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." . . . The rule . . . does not apply, however, "when the nontreating physician relies on independent clinical findings that differ from the findings of the treating physician." . . . "'[T]o the extent that [the nontreating physician's] opinion rests on objective clinical tests, it must be viewed as substantial evidence . . .'"

*Magallanes*, 881 F.2d at 751(citations omitted.)

An ALJ may reject a treating physician's report based on a claimant's exaggerated claims.  *See, e.g., Sandgathe*, 108 F.3d at 980.  A physician's opinion of disability "premised to a large extent upon claimant's own accounts of his symptoms and limitations" may be disregarded where those complaints have been "properly discounted."  *Fair*, 885 F.2d at 605 (citing *Brawner v. Sec. of Health & Human Servs.*, 839 F.2d 432, 433-434 (9th Cir. 1988)); *see Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996),

---

[2]      A treating physician's opinion is not conclusive as to claimant's disability as this ultimate issue is an administrative finding reserved to the Commissioner.  20 C.F.R. § 404.1527(e).  The Commissioner has final responsibility to determine a claimant's residual functional capacity.  20 C.F.R. § 404.1546.

*cert. denied*, 519 U.S. 1113, 117 S.Ct. 953 (1997) ("no physician has been able to find a link between [claimant's] complaints and known medical pathologies").

"[T]he ALJ is responsible for determining credibility, resolving conflicts in the medical testimony, and for resolving ambiguities." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute specific, legitimate reasons to reject the opinion. *Matney*, 981 F.2d at 1020.

After he thoroughly reviewed the medical evidence, the ALJ evaluated the physician opinions:

> . . . In the instant case, the opinions of claimant's treating family practice physician, Dr. La Torre, are give great weight because of the length of the treatment relationship and consistency of the medical progress notes with the claimant's actual functional abilities. The opinions of Dr. Canga's Medical Source Statement of April 7, 2003 are given less weight because his opinions are not consistent with the objective medical evidence, particularly the MRI findings of August 13, 2002. (Exhibit 1F/2) The opinions of the qualified medical examiner, Dr. Rose, are given great weight because he has reviewed the medical record in depth, performed several physical examinations on the claimant, and is a specialist in neurology. The opinions of Dr. Bybee are given great weight because he has examined the claimant several times and is a neurosurgeon. The Undersigned notes there are no significant inconsistencies between the above established residual functional capacity and the findings of Dr. Bybee. The Residual Functional Capacity Assessments by the State Agency physicians are give equal weight because they are not inconsistent with the findings of the specialists and radiographic evidence. (AR 18-19.)

The ALJ properly discounted Dr. Canga's responses to the April 7, 2003 questionnaire and which were inconsistent with the August 13, 2002 MRI of plaintiff's spine. The MRI revealed stable spondylolisthesis and intact fusion at L5-S1 and revealed no evidence of herniation, interval development of disc herniation, intradural or extradural mass, significant enhancement or interval change since the June 13, 2001 MRI. (AR 261.) Dr. Canga's responses were further inconsistent with his own treatment for lower back spasm, recommendations to return to work, and low dose Vicodin prescriptions. (AR 101, 107, 116, 118, 120, 132, 263.)

The ALJ thoroughly detailed the medical evidence, interpreted it and made findings. The ALJ properly accorded great weight to Dr. La Torre, who treated plaintiff for a myriad of physical issues and provided numerous excuses from work. Nonetheless, Dr. La Torre completed a May 3, 2003 questionnaire to conclude that plaintiff is able to perform full-time, more than sedentary work, to lift 20 pounds occasionally and 10 pounds frequently during an eight-hour workday, to sit seven to eight hours during an eight-hour workday, and to stand/walk one or two hours during an eight-hour workday. (AR

190.)  Dr. La Torre based his opinion on his "years of treatment," "office records of 25 years," and consultant's reports. (AR 190.) Dr. La Torre did not find plaintiff's back condition disabling. (AR 191-192.)

Plaintiff points to no error in the weight which the ALJ accorded to the opinion of Dr. Rose, a consultative neurologist. As of June 19, 2002, Dr. Rose limited plaintiff to "no heavy work." (AR 185.) After his April 10, 2002 qualified medical examination, Dr. Rose again limited plaintiff to no heavy work and noted future treatment of judicious use of analgesics and anti-inflammatories. (AR 299.) The ALJ properly relied on the opinions of non-examining physicians Dr. Tambellini and Dr. Pong in that they serve as substantial evidence and "are consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

Plaintiff criticizes the ALJ's failure to consider Dr. Rollins' recommendation of modified limitations to lift, push or pull up to two pounds. (AR 147, 149, 151, 153.) Dr. Rollins made his recommendation shortly after plaintiff's August 10, 1999 work injury. As of June 19, 2002, Dr. Rose found that plaintiff had "almost completely" recovered from that injury. (AR 285.) Plaintiff raises no meaningful issue as to Dr. Rollins.

### Obesity And Other Impairments

Plaintiff contends the ALJ failed to properly evaluate effects of her obesity on her other impairments. The Commissioner responds that plaintiff has not demonstrated that her obesity resulted in greater functional limitations than those found by the ALJ. The ALJ included obesity as one of plaintiff's severe impairments. (AR 16, 20.) Social Security Ruling ("SSR") 02-01p addresses evaluation of obesity and explains:

> Obesity is a risk factor that increases an individual's chances of developing impairments in most body systems. It commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems. Obesity increases the risk of developing impairments such as type II (so-called adult onset) diabetes mellitus-even in children; gall bladder disease; hypertension; heart disease; peripheral vascular disease; dyslipidemia (abnormal levels of fatty substances in the blood); stroke; osteoarthritis; and sleep apnea.

SSA considers obesity to determine whether a claimant has a medically determinable impairment, the impairment(s) is severe, the impairment meets or equals the requirements of an impairment in the Listing of Impairments, and the impairment(s) prevents the claimant from doing past relevant work and other

work that exists in significant numbers in the national economy.  SSR 02-01p.  SSA will find obesity is a "severe" impairment when, along in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities.  SSR 02-01p.

SSA evaluates obesity to assess residual functional capacity:

> Obesity can cause limitation of function.  The functions likely to be limited depend on many factors, including where the excess weight is carried.  An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. . . .

> . . .

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment.  Individuals with obesity may have problems with the ability to sustain function over time. . . .  In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity.  This may be particularly true in cases involving sleep apnea.

> The combined effects of obesity with other impairments may be greater than might be expected without obesity.  For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

SSR 02-01p.

An ALJ has responsibility to determine the effect of a claimant's obesity on the claimant's other impairments, ability to work and general health, given the presence of the other impairments.  *See Celaya v. Halter*, 332 F.3d 1177, 1182 (9th Cir. 2003).

"As obesity is not a separately listed impairment, a claimant will be deemed to meet the requirements if 'there is an impairment that, in combination with obesity, meets the requirements of a listing.'"  *Burch*, 400 F.3d at 682 (quoting SSR 02-01p.)  As noted above, plaintiff fails to satisfy her burden to provide evidence to support the diagnosis and findings of an impairment in the Listing of Impairments.  *See Burch*, 400 F.3d at 683.  A "claimant carries the initial burden of proving a disability."  *Burch*, 400 F.3d at 683; *see Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989).

"Equivalence may also be determined if a claimant has multiple impairments, including obesity, none of which meets the listing requirement, but which when viewed in the aggregate are equivalent to a listed impairment."  *Burch*, 400 F.3d at 682.  However, SSR 02-01p explains that an ALJ "will not

make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. [The ALJ] will evaluate each case based on the information in the case record." The ALJ was "not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." *Burch*, 400 F.3d at 683; *see Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001) (ALJ's failure to consider equivalence was not reversible error because the claimant did not offer any theory, plausible or otherwise, as to how his impairments combined to equal a listing impairment).

Here, plaintiff did not attempt to establish equivalence, and as such, the ALJ was precluded to engage in assumptions about the effects of plaintiff's obesity on other impairments. Plaintiff makes no attempt to demonstrate that her obesity and other impairments significantly limits her ability to perform basic work. Plaintiff points to no error in the ALJ's treatment of her obesity, especially given the absence of specific treatment for it.

Plaintiff claims the ALJ failed to properly address other impairments of COPD, asthma, hypertension, depression and stress. The Commissioner responds that plaintiff has not shown that such impairments caused additional functional limitations.

The record reveals that plaintiff received sporadic treatment for these various impairments which are controlled by medication. Dr. La Torre's recommendation to avoid excess dust or other asthma triggers is insignificant. (AR 191.) January 11, 2000 x-rays revealed no evidence of active cardiopulmonary process. (AR 248.) October 11, 2000 notes reflect plaintiff's normal chest x-ray and good halter monitor study. (AR 227.) As of February 23, 2001, Dr. La Torre noted plaintiff's hypertension under fair control and improved blood pressure and rapid heart problems from new medication. (AR 204.) As of May 3, 2003, Dr. La Torre noted that plaintiff's asthma/COPD does not require a home breathing machine and that he planned neither pulmonary function nor arterial blood gas studies. (AR 191.) Plaintiff takes depression pills and admitted she does not receive treatment for depression. (AR 312.) Plaintiff did not claim depression as a disabling condition and focused on her back pain. (AR 35, 57, 72.) Plaintiff has failed to demonstrate additional severe impairments which

1  restrict her residual functional capacity more than that found by the ALJ.

2  **Plaintiff's Credibility**

3  Plaintiff challenges the ALJ's evaluation of her credibility and argues that the ALJ "failed to give

4  adequate reasons for rejecting credibility."   The Commissioner responds that the ALJ provided

5  "sufficient reasons for rejecting her credibility."

6  "Credibility determinations are the province of the ALJ." *Fair v. Bowen*, 885 F.2d 597, 604 (9th

7  Cir. 1989); *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988).  "An ALJ cannot be required to believe

8  every allegation of disabling pain." *Fair*, 885 F.2d at 603. An ALJ "may disregard unsupported, self-

9  serving statements." *Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1464 (9th Cir.

10  1995).

11  A claimant bears an initial burden to "produce objective medical evidence of underlying

12  'impairment,' and must show that the impairment, or a combination of impairments, 'could reasonably

13  be expected to produce pain or other symptoms.'" *Baston v. Commissioner of Social Security Admin.*,

14  359 F.3d 1190, 1196 (9th Cir. 2004) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)).  If

15  a claimant satisfies such initial burden and "if the ALJ's credibility analysis of the claimant's testimony

16  shows no malingering, then the ALJ may reject the claimant's testimony about severity of symptoms

17  with 'specific findings stating clear and convincing reasons for doing so.'" *Baston*, 359 F.3d at 1196

18  (quoting *Smolen*, 80 F.3d at 1284.)  "If the ALJ finds that the claimant's testimony as to the severity of

19  her pain and impairments is unreliable, the ALJ must make a credibility determination with findings

20  sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's

21  testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

22  If an ALJ's credibility finding is supported by substantial evidence in the record, a reviewing

23  court may not engage in second-guessing. *Thomas*, 278 F.3d at 959.  A reviewing court will not reverse

24  an ALJ's credibility determinations "based on contradictory or ambiguous evidence." *Johnson v.

25  Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (citing *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)).

26  "So long as the adjudicator makes specific findings that are supported by the record, the adjudicator may

27  discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character

28  evidence." *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991).  Moreover, "the ALJ is entitled to

draw inferences 'logically flowing from the evidence.'" *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

In *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), the Ninth Circuit commented:

> In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Smolen*, 80 F.3d at 1284; *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (quoting *Orteza v. Shalala*, 50 F.3d 748, 749-50 (9th Cir. 1995)); 20 C.F.R. § 404.1529(c). An ALJ's finding that a claimant generally lacked credibility is permissible basis to reject excess pain testimony.

*See also* S.S.R. 96-7p.[3]

An ALJ may consider the following factors to determine the credibility of a claimant's allegations of disabling pain:

1.  The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

2.  Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

3.  Type, dosage, effectiveness, and adverse side-effects of pain medication;

4.  Treatment, other than medication, for pain relief;

5.  Functional restrictions;

6.  Claimant's daily activities;

7.  Unexplained, or inadequately explained, failure to seek treatment or to follow up a prescribed course of treatment; and

8.  Ordinary techniques to test a claimant's credibility.

*Bunnell*, 947 F.2d at 346; *see* 20 C.F.R. §§ 404.1529, 416.929.

After detailing plaintiff's medical treatment and testimony, the ALJ thoroughly addressed

---

[3]     Social Security Ruling 96-7p sets out factors to assess a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

1  plaintiff's credibility (AR 16-18):

2      Based on a careful review of the entire medical record and the testimony of the claimant,
3 the Undersigned finds the claimant's allegations are not credible and not supported by
substantial medical evidence.  In particular, the Undersigned finds that all treating and
4 examining physicians do not opine the claimant is disabled.  The claimant's treating
physician, Dr. La Torre, who has treated the claimant for 25 years, specifically opines the
5 claimant is not disabled from light work.  The MRI documents a stable spondylolisthesis
and solid fusion and the claimant worked for many years after her 1987 fusion,
6 performing the same work until February 2002.  The Undersigned is persuaded by the
opinions of the qualified medical examiner, neurologist Dr. Rose, that the claimant is
7 limited only in performing heavy work and he opines the claimant is unable to perform
her past work as of April 2002.  (Exhibit 8F/23) The Undersigned also notes that the
8 claimant was discharged from Dr. Canga's care and returned to regular duty by him on
September 20, 2001 and she continued to work at her previous job until she left that job
9 in February 2002.  The Undersigned recognizes that the claimant had a vocational
rehabilitation evaluation performed during May 2003 that found the claimant could not
10 perform sustained work.  However, the Undersigned is not convinced by this evaluation
and notes that it is not performed by an acceptable medical source under the Regulations
11 and is inconsistent with each of the treating and examining physicians' treatment notes,
radiographic evidence, and opinions regarding her ability to perform sustained work at
the light level.  (AR 18.)

12

13      As discussed above, plaintiff has failed to demonstrate an impairment or combination of

14 impairments which could reasonably be expected to produce pain and limitations to the degree which

15 she claims.  *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (objective medical evidence "is

16 still a relevant factor in determining the severity of the claimant's pain and its disabling effects.")

17 Nonetheless, the ALJ provided specific findings and clear and convincing reasons to discredit plaintiff.

18 The ALJ pointed to Dr. La Torre and Dr. Rose's conclusions that plaintiff is not disabled.  *See Moncada*

19 *v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (physician opinion that claimant could perform sedentary

20 work is a specific reason to discredit excessive pain testimony).  The ALJ pointed to the MRI

21 demonstrating stable spondylolisthesis and solid fusion.  (AR 261.)  *See Drouin v. Sullivan*, 966 F.2d

22 1255, 1258-1259 (9th Cir. 1991) (medical records indicated physical impairments are not necessarily

23 associated with pain).  The ALJ noted that plaintiff continued her heavy factory work after her 1987

24 fusion surgery until February 2002 and that Dr. Canga discharged plaintiff to regular duty in September

25 2001.  The ALJ adequately discounted the vocational rehabilitation evaluation, which plaintiff mentions

26 in passing.  Plaintiff fails to substantiate her complaint that the ALJ failed "to fully report the testimony

27 from the hearing and go over each symptom."

28      The record reveals further grounds to question plaintiff's credibility.  As of August 1999, Dr.

1    Rollins noted plaintiff's ease to ambulate and sit, despite her claims to the contrary, and "signs of

2    symptom amplification, in that the patient's reported subjective complaints are disproportional to her

3    objective findings." (AR 150, 152.) In 1999, Dr. Bybee, a neurologist, treated plaintiff briefly with no

4    planned further treatment. (AR 145.) When Dr. Bybee treated plaintiff again in September 2002, he

5    found her in no acute distress and provided her samples of a nonsteroidal anti-inflammatory. (AR 135,

6    136.) Dr. Canga treated plaintiff with low dosage Vicodin. (AR 101, 107.) Dr. Rose recommended

7    judicious use of analgesics and anti-inflammatories. (AR 299.)  *See Johnson v. Shalala*, 60 F.3d 1428,

8    1434 (9th Cir. 1995) ("conservative treatment" suggests "a lower level of both pain and functional

9    limitation.") Plaintiff repeatedly pursued Dr. La Torre for excuses from work for a myriad of issues,

10   including asthmatic bronchitis, lung infection, gynecological problems, pelvic and abdominal pain,

11   shakiness, dizziness and rapid heart rate, heart, chest, lung and fatigue problems, blood pressure and

12   chest symptoms, dry cough, change in blood pressure medication, and low back and buttocks pain and

13   spasms. (AR 199-201, 205, 206, 208-213, 216, 225-227, 230, 231, 234, 236-238, 240, 241, 248, 249)

14   A day before Dr. La Torre released plaintiff to work, plaintiff presented with a claim that she hurt herself

15   when lifting a desk and alleged she "feels she can't work yet." (AR 232, 233.)  Finally, Dr. La Torre

16   recognized he felt "like a fool" for continuing to write work excuses. (AR 211.) Dr. La Torre's records

17   rebut plaintiff's insinuation that she put forth a good effort to work.

18       Substantial evidence supports the ALJ's specific findings on plaintiff's credibility to preclude

19   this Court to second guess the ALJ.  Plaintiff fails to demonstrate error in the ALJ's evaluation of

20   plaintiff's credibility.

21                          **Absence Of Vocational Expert**

22       Plaintiff briefly complains that the presence of several nonexertional limitations warranted

23   vocational expert testimony.  The Commissioner responds that the ALJ properly relied on the Medical-

24   Vocational Guidelines.

25       In the final step of the five-step disability evaluation, the Commissioner has the burden to show,

26   in light of a claimant's residual functional capacity, he/she can engage in other substantial gainful work

27   that exists in the national economy.  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).  The

28   Commissioner may meet this burden by testimony of a vocational expert or reference to the Medical-

1   Vocational Guidelines. *Osenbrock*, 240 F.3d at 1162.

2       If a claimant has significant non-exertional impairments, an ALJ cannot rely on the Medical-

3   Vocational Guidelines (also known as "grids"). *Osenbrock*, 240 F.3d at 1162. "Non-exertional

4   limitations are limitations that do not directly affect a claimant's strength." *Buckart v. Bowen*, 856 F.2d

5   1335, 1340 (9th Cir. 1988); *see* 20 C.F.R. § 416.969a(c). An ALJ correctly applies the Medical-

6   Vocational Guidelines when a claimant fails to establish a significant non-exertional impairment. *Marci*

7   *v. Chater*, 93 F.3d 540, 545 (1996). If the Medical-Vocational Guidelines fail to accurately describe a

8   claimant's limitations, an ALJ may not rely on the Medical-Vocational Guidelines alone to show the

9   availability of jobs for the claimant and must hear testimony of a vocational expert. *Reddick v. Charter*,

10  157 F.3d 715, 729 (9th Cir. 1998); *Jones*, 760 F.2d at 998. When vocational expert testimony is used,

11  the vocational expert must identify a specific job or jobs in the national economy having requirements

12  that the claimant's physical and mental abilities and vocational qualifications would satisfy. *Osenbrock*

13  *v. Apfel*, 240 F.3d at 1162-1163.[4]

14      In *Desrosiers v. Secretary of Health and Human Servs.,* 846 F.2d 573, 576 (9th Cir. 1988), the

15  Ninth Circuit Court of Appeals provided ALJs guidance to address claims of non-exertional limitations:

16      [T]he fact that a non-exertional limitation is alleged does not automatically preclude
        application of the grids. The ALJ should first determine if a claimant's non-exertional
17      limitations significantly limit the range of work permitted by his exertional limitations.
        *Razey v. Heckler*, 785 F.2d 1426, 1430 (9th Cir. 1986); *Blacknall v. Heckler*, 721 F.2d
18      1179, 1181 (9th Cir. 1983); *Olde v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983).

19          The ALJ must weigh conflicting evidence concerning the claimant's past work
        experience, education, and present psychological and physical impairments. The ALJ
20      then applies the grids to these factors, ensuring that the final determination will be both
        consistent with other similar cases and expeditious. The claimant may challenge the
21      sufficiency of the evidence supporting the ALJ's assessment. A non-exertional
        impairment, if sufficiently severe, may limit the claimant's functional capacity in ways
22

23      [4]     The Ninth Circuit Court of Appeals has further noted:

24          When a claimant's non-exertional limitations are "sufficiently severe" so as to significantly limit
        the range of work permitted by the claimant's exertional limitations, the grids are inapplicable. *Desrosiers*,
25      846 F.2d at 577. In such instances, the Secretary must take testimony of a vocational expert, *Jones*, 760
        F.2d at 998, and identify specific jobs within the claimant's capabilities. *Kail v. Heckler*, 722 F.2d 1496,
26      1498 (9th Cir. 1984). Thus, the grids will be inappropriate where the predicate for using the grids – the
        ability to perform a full range of either medium, light or sedentary activities – is not present.
27

28  *Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988).

1   not contemplated by the guidelines.  In such a case, the guidelines would be inapplicable.

2        All this can be accommodated to a system of fair and expeditious disposition of
3   claims by those asserting pain or other non-exertional limitations.  It is not necessary to
    permit a claimant to circumvent the guidelines simply by alleging the existence of a non-
    exertional impairment, such as pain, validated by a doctor's opinion that such
4   impairment exists.  To do so frustrates the purpose of the guidelines.

5   *Desrosiers,* 846 F.2d at 577 (citing decisions from the Second, Fourth, Fifth, Sixth and Eighth Circuit

6   Courts of Appeals).

7        The ALJ carefully reviewed plaintiff's limitations and concluded:

8        The claimant's ability to perform all or substantially all of the requirements of sedentary
         work is impeded by additional exertional and/or non-exertional limitations.  Based on
9        the claimant's limitations of occasional climbing stairs, kneeling, balancing, stooping,
         crouching, and crawling, the Undersigned finds that the occupational base for light and
10       sedentary jobs is not significantly eroded.  As such, the Undersigned finds that based on
         the claimant's above established residual functional capacity and her age, education, and
11       past work background, the claimant is able to perform a significant number of the 1,600
         separate administratively noticed light and sedentary jobs.  Thus, the Undersigned finds
12       the claimant is able to perform a significant number of jobs that exists in the national
         economy.  (20 CFR Pt. 404, Subpart P, Appendix 2, Medical-Vocational Rule 202.00)
13       (AR 19-20.)

14       As detailed above, plaintiff has failed to demonstrate a significant non-exertional impairment or

15  that non-exertional limitations significantly limit the range of work permitted by her exertional

16  limitations.  The Commissioner correctly notes that the ALJ accommodated plaintiff's back impairment

17  to the extent the ALJ found plaintiff's claims credible.  Plaintiff appears to attempt to circumvent the

18  Medical-Vocational Guidelines by alleging the a non-exertional impairment – pain.  Plaintiff points to

19  no error in the ALJ's use of the Medical-Vocational Guidelines.

20                              **CONCLUSION AND ORDER**

21       For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ

22  properly concluded plaintiff is not disabled. This Court further finds the ALJ's decision is supported by

23  substantial evidence in the record as a whole and based on proper legal standards. Accordingly, this

24  Court DENIES plaintiff's request to reverse the Commissioner's decision to deny plaintiff disability

25  insurance benefits or to remand for further proceedings. This Court DIRECTS the Court's clerk to enter

26  judgment in favor of defendant Jo Anne B. Barnhart, Commissioner of Social Security, and against

27  / / /

28  / / /

1    plaintiff Linda Miller and to close this action.

2         IT IS SO ORDERED.

3    **Dated:   January 5, 2006   **            **   /s/ Lawrence J. O'Neill   **
     66h44d                            UNITED STATES MAGISTRATE JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28